# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 6, 2026

Lyle W. Cayce
Clerk

_____

No. 25-20496

_____

VICTOR BUENROSTRO-MENDEZ,

*Petitioner—Appellee*,

*versus*

PAMELA BONDI, *U.S. Attorney General*; KRISTI NOEM, *Secretary, U.S. Department of Homeland Security*; TODD M. LYONS, *Acting Director, United States Immigration and Customs Enforcement*; MATTHEW W. BAKER, *Acting ICE Houston Field Office Director, United States Immigration and Customs Enforcement*; JOHN LINSCOTT, *ICE Director, Houston Contract Detention Facility, United States Immigration and Customs Enforcement*; MARTIN FRINK, *Warden, Houston Contract Detention Facility, CoreCivic*,

*Respondents—Appellants*,

CONSOLIDATED WITH

_____

No. 25-40701

_____

JOSE PADRON COVARRUBIAS,

*Petitioner—Appellee*,

*versus*

MIGUEL VERGARA, *ICE Field Office Director, San Antonio ICE Detention and Removal*; KRISTI NOEM, *Secretary, U.S. Department of Homeland Security*; SUSAN AIKMAN, *In her official capacity, as Assistant Chief Counsel Office of Chief Counsel, U.S. Immigration and Customs Enforcement*; PAMELA BONDI, *U.S. Attorney General*,

*Respondents—Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Texas
USDC Nos. 4:25-CV-3726, 5:25-CV-112

_____

Before JONES, DUNCAN, and DOUGLAS, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

The statutory interpretation issue posed by these alien petitioners is novel but not recondite. The petitioners concede that they are deemed to be "applicants for admission," i.e., "alien[s] present within the United States who ha[ve] not been admitted" by lawful means. 8 USC §§ 1225(a)(1), 1101(a)(13)(A) (definition of admission). Each of them entered illegally many years ago. As such, the government contends, because neither petitioner showed himself to be "clearly and beyond a doubt entitled to be admitted," he "shall be detained" pending his removal proceeding. 8 U.S.C. § 1225(b)(2)(A). The petitioners counter that, despite falling squarely within § 1225, they are nonetheless eligible for discretionary release on bond during removal proceedings. Section 1226(a)(2), they contend, applies to them precisely because they did not "seek [lawful] admission" according to § 1225. 8 U.S.C. § 1226(a)(2). These provisions were framed by the IIRIRA immigration reform legislation in 1996, Pub. L. 104-208, 110 Stat. 3009 (1996), but their interrelation had not been adjudicated until the past few months, when the current Presidential Administration began detaining illegal alien residents, like the petitioners here, for removal proceedings without

2

25-20496
c/w No. 25-40701

bond, rather than bonding and releasing them. After reviewing carefully the relevant provisions and structure of the Immigration and Naturalization Act, the statutory history, and Congressional intent, we conclude that the government's position is correct. We REVERSE the district courts' orders to provide petitioners with bond hearings or release them and REMAND for further proceedings consistent with this opinion.

## Background

### I.    Statutory Background

Before 1996, the detention provisions in the Immigration and Nationality Act (INA) distinguished between aliens who presented at a port of entry and those who evaded inspection. *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 222–24 (BIA 2025); *see also Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010); 8 U.S.C. §§ 1225(a), 1251(a) (1994). Aliens who arrived at a port of entry were subject to mandatory detention until the conclusion of the exclusion process and could not request release on bond. *Id.* at 223. In contrast, aliens who evaded inspection and were apprehended months or years later could seek release on bond pending deportation proceedings. *Id.* In this and other ways, the statute thus afforded greater procedural and substantive rights to aliens who bypassed entry procedures. *See* H.R. Rep. No. 104-469, pt. 1, at 225 (1996) ("[I]llegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection.").

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) aimed to reduce this incongruity. In 8 U.S.C. § 1225(a)(1), Congress provided for the inspection by immigration authorities of aliens present in the country together with aliens arriving at the border. It provided that:

3

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1). Aliens who meet that statutory definition qualify as applicants for admission "whether or not [they arrived] at a designated port of arrival."[1] *Id.* Following the passage of IIRIRA, then, an alien's status as an applicant for admission does not turn on where or how the alien entered the United States.

In 8 U.S.C. § 1225(b)(2)(A), Congress provided for the detention of applicants for admission:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.[2]

8 U.S.C. § 1225(b)(2)(A). As the Supreme Court has said, Section 1225(b)(2) operates as a "catchall provision that applies to all applicants for admission not covered by [subsection (b)(1)]." *Jennings v. Rodriguez*, 583 U.S. 281, 287, 138 S. Ct. 830, 837 (2018). Section 1225(b)(2) does not

---

[1] By covering both unadmitted aliens present in the United States and those who arrive at the country's border, Section 1225(a)(1) "ensure[d] that all immigrants who have not been lawfully admitted, regardless of their presence in the country, are placed on equal footing in removal proceedings under the INA." *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc).

[2] Section 1225(b)(1) lays out an alternative framework for detention and removal of aliens who qualify for expedited removal proceedings. 8 U.S.C. § 1225(b)(1)(A)(i)–(iii).

25-20496
c/w No. 25-40701

include any exception that permits the government to release detained aliens on bond.[3]

The INA, as amended by IIRIRA, also contains provisions applicable to aliens in general, including those who are not applicants for admission. *See* 8 U.S.C. § 1226. Under that section, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Unlike § 1225(b), § 1226(a)(2)(A) permits, but does not require, the Attorney General to release detained aliens on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General." *See also* 8 C.F.R. §§ 236.1(c)(8), (d), 1236.1(d)(1), 1003.19. Because § 1226 is not limited to applicants for admission, it also covers numerous grounds of deportability, including for admitted aliens who overstay or violate the terms of their visas, engage in conduct that renders them removable, or were improperly admitted.

Not all aliens detained under § 1226(a) are eligible for release on bond. If an alien has committed one of the criminal offenses enumerated in § 1226(c), he loses his bond eligibility. 8 U.S.C. § 1226(c)(1)(A)–(E). The Laken Riley Act, enacted in 2025, expanded § 1226(c) by adding new bases for ineligibility for bond. *See* 8 U.S.C. § 1226(c)(1)(E). Aside from being ineligible for bond, aliens covered by § 1226(c) also may not be granted parole under 8 U.S.C. § 1182(d)(5)(A).

From 1997 to 2025, successive presidential administrations and many immigration judges treated unadmitted aliens as being subject to § 1226(a)

---

[3] DHS retains the authority to, in its discretion, exercise its parole authority to temporarily release applicants. 8 U.S.C. § 1182(d)(5)(A). But DHS may only use this authority "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* DHS did not grant parole to either Petitioner here.

5

25-20496
c/w No. 25-40701

rather than § 1225(b)(2). But, in July 2025, the Board of Immigration Appeals (BIA) decided *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, which reconsidered the statutory framework and concluded that aliens who enter the United States without inspection and admission are subject to mandatory detention under § 1225(b)(2). In reaching that conclusion, the BIA explained that "[r]emaining in the United States for a lengthy period of time following entry without inspection, by itself, does not constitute an 'admission.'" *Hurtado*, 29 I. & N. Dec. at 228. Accordingly, unadmitted aliens apprehended anywhere in the United States are ineligible for release on bond, regardless of how long they have resided inside the United States. *Id.* at 225.

Since DHS began to detain unadmitted aliens under § 1225(b)(2)(A), well over a thousand aliens have filed habeas corpus petitions seeking bond hearings. In most of these cases, the district court found in favor of the petitioner. *See Barco Mercado v. Francis*, No. 25-cv-6582, --- F. Supp. 3d ----, 2025 WL 3295903, at *13 (S.D.N.Y. Nov. 26, 2025) (listing 350 decisions that found for the habeas petitioner).[4]

## II.   Factual and Procedural Background

Petitioners Victor Buenrostro-Mendez and Jose Padron Covarrubias are citizens of Mexico who entered the US illegally. Buenrostro-Mendez entered in 2009; Covarrubias entered in 2001. DHS encountered each petitioner in 2025, and, upon inspection, immigration officers determined that each was inadmissible as an alien present in the United States without having been admitted or paroled. *See also* 8 U.S.C. § 1182(a)(6)(A)(i). DHS commenced removal proceedings under 8 U.S.C. § 1229a against both

---

[4] But notable exceptions to these decisions exist. *See, e.g.*, *Garibay-Robledo v. Noem*, No. 1:25-CV-177-H, 2026 WL 81679 (N.D. Tex. Jan. 9, 2026); *Cabanas v. Bondi*, No. 4:25-CV-04830, 2025 WL 3171331 (S.D. Tex. Nov. 13, 2025).

petitioners, directing that they be detained under 8 U.S.C. § 1225(b)(2)(A) for the duration of those proceedings.

Buenrostro-Mendez and Covarrubias sought bond hearings before an immigration judge. Both immigration judges concluded that the petitioners were ineligible for bond hearings under § 1225(b)(2). Both petitioners appealed to the BIA, and the petitioners have either sought or plan to seek relief under 8 U.S.C. § 1229(b) in the form of applications for cancellation of removal and adjustment of status.

Covarrubias filed a habeas petition in July 2025 seeking release from detention or a bond hearing under 8 U.S.C. § 1226(a). His petition alleged violations of the INA, Fifth Amendment, and APA. Buenrostro-Mendez filed a habeas petition in August 2025 alleging substantially similar violations.[5]

The district court granted Covarrubias's habeas petition and ordered that he receive a bond hearing. The court reasoned that the phrase "seeking admission" in § 1225(b)(2)(A) uses the present tense and thus applies only to individuals "currently and actively seeking to be admitted to the United States when [they are] apprehended." Because Covarrubias was not actively involved in any admission proceedings, the court explained, his detention was subject to § 1226(a), not § 1225(b)(2). The court also feared that the government's interpretation would render portions of § 1226 superfluous. The district court that handled Buenrostro's habeas petition reached a similar conclusion. After their habeas petitions were granted, Covarrubias and Buenrostro both received bond hearings and were subsequently released.

---

[5] Buenrostro-Mendez also filed a motion for a TRO requesting the same relief as in his habeas petition.

25-20496
c/w No. 25-40701

The government appealed.[6] The two cases were consolidated for review, and this court, after initially refusing to expedite to oral argument, reconsidered and expedited to this panel. We have received full briefing and amicus briefs.

## Standard of Review

This court reviews *de novo* a district court's grant of a petition for a writ of habeas corpus under 28 U.S.C. § 2241. *Pack v. Yusuff*, 218 F.3d 448, 451 (5th Cir. 2000).

## Discussion

The petitioners concede that they are applicants for admission within the meaning of § 1225(a)(1). At the time ICE apprehended them, they were present in the United States and had not been admitted. Presence without admission deems the petitioners to be applicants for admission. *Id.*

Nor do the petitioners dispute that if § 1225(b)(2)(A) applies to them, it would require their detention without eligibility for bond. The statute unambiguously provides for mandatory detention. *See* 8 U.S.C. § 1225(b)(2)(A) (providing that aliens "*shall* be detained") (emphasis added); *see also Jennings*, 583 U.S. at 302, 138 S. Ct. at 845 ("§§1225(b)(1) and (b)(2) *mandate* detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin.") (emphasis added). And "neither § 1225(b)(1) nor § 1225(b)(2) says

---

[6] Pamela Bondi, the U.S. Attorney General, and Kristi Noem, the Secretary of the DHS, are appellants in both appeals. In Buenrostro-Mendez's appeal, the Respondent-Appellants also include Todd M. Lyons, the Acting Director of ICE; Matthew W. Baker, ICE's Houston Field Office Director; John Linscott, the ICE Director of the Houston Contract Detention Facility; and Martin Frink, the warden at a Houston contract detention facility. In Covarrubias's appeal, Miguel Vergara, the ICE Field Office Director for San Antonio, and Susan Aikman, ICE's Assistant Chief Counsel are additional appellants.

anything whatsoever about bond hearings." *Jennings*, 583 U.S. at 297, 138 S. Ct. at 842.

Despite these concessions, the petitioners insist that they fall outside of the scope of § 1225(b)(2)(A). They argue that § 1225(b)(2)(A) applies only to aliens who are both "applicants for admission" and "seeking admission." Pointing to a definition of "admission" in 8 U.S.C. § 1101(a)(13)(A), the petitioners contend that "admission" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." According to the petitioners, then, "seeking admission" refers only to those aliens who are actively pursuing lawful entry and submitting themselves to inspection by an immigration officer. When ICE apprehended the petitioners, neither was actively engaged in admissions procedures. Thus, they argue, they were not seeking admission and § 1225(b)(2)(A) does not apply to them.

The text and context of § 1225 contradict the petitioners' reading of the statute. A proper reading begins with the ordinary meaning of the language in § 1225(b)(2)(A). "There is no material disjunction—by the terms of the statute or the English language—between the concept of 'applying' for something and 'seeking' something." *Garibay-Robledo v. Noem*, No. 1:25-CV-177-H, 2026 WL 81679, at *5 (N.D. Tex. Jan. 9, 2026). When a person applies for something, they are necessarily seeking it. *Compare* Webster's New World College Dictionary 69 (4th ed.) ("apply" means "To make a formal request (to someone for something)"), *with id.* at 1299 ("seek" means "to request, ask for"); *see also* The American Heritage Dictionary of the English Language 63 (1980) ("American Heritage Dictionary") ("apply" means "[t]o request or seek employment, acceptance, or admission"). Just as an applicant to a college seeks admission, an applicant for admission to the United States is "seeking admission" to the

25-20496
c/w No. 25-40701

same, regardless whether the person actively engages in further affirmative acts to gain admission.[7] The everyday meaning of the statute's terms confirms that being an "applicant for admission" is not a condition independent from "seeking admission."[8]

The petitioners first respond that "seeking" is in the present tense, and it thus requires some form of present, affirmative action. Once again, the ordinary meaning of the terms suggests otherwise. Return to the example of the college applicant. It would make no sense to say that as soon as the applicant clicks "submit" on her application, she is no longer seeking admission, merely because she does not take any further affirmative steps to gain admittance. Instead, she would ordinarily be understood to be seeking admission as long as her application is pending. The same is true here. The petitioners are deemed, by statute, to be applicants for admission pending the resolution of removal proceedings. While they remain applicants, they are presently seeking admission. That "seeking admission" is equivalent to

_____

[7] Because the text of § 1225(b)(2)(A) is clear, it is no mousehole, contrary to the dissent's characterization. Section 1225(a)(1) unambiguously has a sweeping scope, and, for the reasons discussed in this opinion, the section gets no narrower after that initial definition.

[8] Contrary to the petitioners' contention, the Ninth Circuit's en banc decision in *Torres*, 976 F.3d at 918, does not conflict with this interpretation. The court there concluded that an "applicant for admission" need not necessarily have submitted an "application for admission." *Torres*, 976 F.3d at 926. Of course, this conclusion is correct based on the text of § 1225(a), which deems aliens "applicants for admission" regardless of whether they file a formal admission application. But *Torres* has nothing to do with the meaning of "seeking admission" and whether an "applicant for admission" is necessarily someone "seeking admission."

Also inapplicable is the Seventh Circuit's recent motions panel decision in *Castanon-Nava v. U.S. Dep't. of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025). As a motions panel decision, it would not be entitled to precedential status before an oral argument panel in this court, so even less are we bound to a similar motions panel decision by another circuit.

10

being an "applicant for admission" by operation of law was confirmed by the BIA over a decade ago in *Matter of Lemus-Losa,* 25 I&N Dec. 734, at 743 (2012).[9]

Next, the petitioners contend that interpreting "applicant for admission" to necessarily entail "seeking admission" would render "seeking admission" redundant in the text of § 1225(b)(2)(A). To the extent that the government's interpretation creates any redundancy between these terms, that redundancy does not give this court a "license to rewrite ... another portion of the statute contrary to its text." *Barton v. Barr,* 590 U.S. 222, 239, 140 S. Ct. 1442, 1453 (2020). The Supreme Court has observed that "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Id.* Moreover, there is "no canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing." *Jennings,* 583 U.S. at 303, 138 S. Ct. at 845–46 (quoting *Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 540, 133 S. Ct. 1351, 1364 (2013)). That seems doubly true where the ordinary meaning of the terms involved overlap. Because being an applicant ordinarily entails seeking something, it seems natural to use the words somewhat interchangeably

---

[9] "In ordinary parlance, the phrase 'seeks admission' connotes a request for *permission* to enter….The problem, however, is that Congress has defined the concept of an 'applicant for admission' in an unconventional sense, to include not just those who are expressly seeking permission to enter, but also those who are present in this country without having formally requested or received such permission….In other words, many people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws." *Lemus-Losa,* 25 I&N Dec. at 743 (emphasis in original).

Undeterred, the petitioners argue that "applicant for admission" is a term of art, so it cannot be understood according to its ordinary meaning. But the remaining provisions of § 1225 confirm that applicants for admission are indeed necessarily seeking admission. Most notably, § 1225(a)(3) specifies that "[a]ll aliens (including alien crewmen) who are applicants for admission *or otherwise* seeking admission or readmission to or transit through the United States shall be inspected by immigration officers" (emphasis added). The use of "or otherwise" suggests that "applicants for admission" are a subset of those "seeking admission." *See Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963–64 (11th Cir. 2016) (en banc) (concluding that the phrase "or otherwise" means "the first action is a subset of the second action"); *Kleber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019) (same). As the government points out, when an English speaker uses a phrase such as "to bike, jog, or otherwise exercise," the first two items constitute one item out of the overall set. Accordingly, an "applicant for admission" is necessarily someone who is "seeking admission."

Section 1225(a)(5) reinforces the same relationship between "applicants for admission" and "seeking admission." It provides that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States ...." 8 U.S.C. § 1225(a)(5). That language strongly suggests that those who are applicants for admission are "seeking admission."

The petitioners offer no persuasive response to these provisions. With respect to § 1225(a)(3), they suggest that "or otherwise" means that aliens "seeking admission" are proceeding in "in a different way or manner" than "applicants for admission." But if that were true, Congress would simply have said "applicants for admission *or* those seeking admission."

Adhering to the petitioners' reading would render the "otherwise" surplusage, because "or otherwise" does not mean the same thing as "or."

The other alternative offered by the petitioners makes no more sense than the first one. They suggest that the "'or otherwise language' merely clarifies *which* applicants for admission are required to be inspected under § 1225(a)(3): namely, those who, like the other noncitizens described in the 'or otherwise' clause, are requesting permission to enter, reenter, or transit through the country." This interpretation ignores the beginning of § 1225(a)(3), which mandates inspection for "*all* applicants for admission." (emphasis added). Given that language, the "or otherwise" language cannot possibly be clarifying which subset of applicants for admission (a)(3) applies to, because it unambiguously applies to all of them. Furthermore, if the petitioners are right that only those who are actively seeking admission are subject to the inspection requirement of § 1225(a)(3), then their reading would eliminate the inspection requirement for aliens entering the country unlawfully. Doing so would return to the pre-IIRIRA regime in which illegal entrants receive favorable treatment compared to aliens lawfully undergoing admission procedures.

To make matters worse for the petitioners, if Congress had intended an alien "seeking admission" to effectively mean "arriving alien," it would simply have said "arriving alien." Congress did not hesitate to use the "arriving alien" language elsewhere in § 1225. *See* §§ 1225(a)(2), (c)(1), (d)(2). Despite Congress's decision to use "seeking admission" in the same breath as "applicant for admission" not once, but three times, the petitioners urge the court to interpret "seeking admission" in the same way as language Congress elected not to use in any of §1225(b)(2)(A), (a)(3), and (a)(5).

That is not the only textual oddity that results from the petitioners' reading. The petitioners would have the court believe that Congress defined

"applicant for admission" broadly in § 1225(a)(1) to include all "alien[s] present in the United States who [have] not been admitted," but then, every time it subsequently used the phrase in § 1225, narrowed it to apply only to those actively seeking admission. Under that interpretation, Congress could simply have defined "applicants for admission" as those arriving in the United States, omitting from the definition any reference to aliens "present in the United States who ha[ve] not been admitted."[10] 8 U.S.C. § 1225(a)(1).

Finally, contrary to the petitioners' contention, the government's interpretation does not render portions of § 1226 superfluous. Section 1226(a) undeniably does work independent from § 1225(b)(2)(A) because only § 1226(a) applies to admitted aliens who overstay their visas, become deportable on many different grounds, or were admitted erroneously due to fraud or some other error.[11] The petitioners instead focus on § 1226(c) as amended by the Laken Riley Act. Why, they ask, would Congress have seen

---

[10] The dissent suggests that "§ 1225, with the exception of § 1225(a)(1)'s definitions provision, *is about noncitizens attempting to enter the United States*." This is precisely the problem with the dissent's reading. If § 1225 truly only concerns aliens arriving in the United States, then the definition in § 1225(a)(1) could have excluded unadmitted aliens present in the United States entirely. The dissent's response—that the broad definition of "applicant for admission" still matters because the term is used in 8 U.S.C. 1229a—vastly overstates the term's relevance to § 1229a. The term "applicant for admission" only appears once in § 1229a, in § 1229a(c)(2), to define the burden applicants for admission bear in removal proceedings. But if this is the only reason "applicant for admission" extends beyond "arriving aliens," then why would Congress not merely specify in § 1229(c)(2)that the provision applies to both arriving aliens and those already present? Again, it is a bizarre construction to suggest that Congress established a broad definition in § 1225 but, despite repeatedly using the term in § 1225, used the full breadth of the definition only in a corollary provision in a completely independent section of the code.

[11] Section 1226(a) covers certain inadmissible aliens who are not applicants for admission. Erroneously admitted aliens who were "inadmissible" at the time of entry remain inadmissible, but they fall outside of the definition in § 1225(a)(1) because they have been admitted.

a need to specify that certain aliens are ineligible for bond if those aliens are already subject to mandatory detention under § 1225(b)(2)(A)? The answer is simple enough. Not only does § 1226(c) sweep in deportable aliens in addition to the inadmissible aliens covered by § 1225(b)(2)(A), *see* 8 U.S.C. § 1226(c)(1)(B)–(C), it also eliminates the option of parole for those to whom it applies.[12] As for the Laken Riley Act, Congress passed the Act at a time when the Executive was still declining to exercise its full enforcement authority under the INA.[13] Accordingly, the Act did have a substantial effect when passed insofar as it required the detention without bond or parole of certain aliens the administration was then treating as bond-eligible.

The Supreme Court's opinion in *Jennings v. Rodriguez* does not suggest, much less require a different result. The petitioners emphasize a passage in *Jennings* in which the Supreme Court describes § 1225(b) as applying to "aliens seeking admission" and § 1226 as applying to "aliens already in the country." *Jennings*, 583 U.S. at 289, 138 S. Ct. at 838. This appeal to *Jennings* is unpersuasive for several reasons.

First, the passage the petitioners cite is part of a general description. The issue in *Jennings* was whether the constitutional avoidance canon required the government to grant periodic bond hearings to aliens facing

---

[12] The petitioners object that "subsection (c) [of § 1226] is simply a limit on the authority conferred by subsection (a)." *Nielsen v. Preap*, 586 U.S. 392, 409, 139 S. Ct. 954, 966 (2019). Thus, the government cannot say that the elimination of parole under § 1226(c) applies to aliens under § 1225(b)(2)(A) without conceding that those aliens also fall under § 1226(a). Of course, the government does acknowledge that § 1225(b)(2)(A) and § 1226(a) partially overlap. Just as aliens who fall under both provisions may not seek bond because of the mandatory detention required by § 1225(b)(2)(A), aliens who fall under both § 1225(b)(2)(A) and § 1226(c) may not receive parole because of the limitation in § 1226(c).

[13] Congress enacted the Laken Riley Act in January 2025, predating DHS's decision to begin exercising its full enforcement authority in July 2025.

15

prolonged detention under § 1225 and § 1226. *Id.* at 291, 138 S. Ct. at 839. In determining that aliens lacked a statutory right to periodic bond hearings, the *Jennings* court did not opine on the difference between detention authority under § 1225 and § 1226. At most, the language petitioners cite is dicta.

Second, the *Jennings* language does not refute the government's interpretation. It is true that § 1226 applies to aliens in the United States. That it does so, however, does not preclude § 1225 from also applying to such aliens. As the government acknowledges, the two provisions overlap. Accordingly, for petitioners to find support in *Jennings*, they must overread the Supreme Court's language. In particular, they seem to infer that when the Supreme Court specified that § 1226 applies to aliens inside the United States, it implied that § 1225 does not apply to such aliens. But this is the exact sort of language-parsing inquiry that the Supreme Court has cautioned lower courts against. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74, 143 S. Ct. 1142, 1155 (2023) ("[T]he language of an opinion is not always to be parsed [like the] language of a statute." (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341, 99 S. Ct. 2326, 2332 (1979))).

Moreover, even if this court should conduct a granular analysis of the language in *Jennings*, doing so supports the government's interpretation. In claiming that the Supreme Court's pronouncement that § 1225(b) applies to aliens who are seeking admission supports their interpretation, the petitioners inexplicably assume that the Supreme Court understood "seeking admission" in the same way that petitioners do. It demonstrably did not. Elsewhere in *Jennings*, the Supreme Court explained that "§ 1225(b) applies to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)." *Jennings*, 583 U.S. at 297, 138 S. Ct. at 842. That language supports the government's contention that

"applicants for admission" are according to the statute seeking entry or admission. And it suggests that when the Supreme Court described § 1225 as applying to aliens "seeking admission," it understood that to mean aliens who, like the petitioners here, are present in the United States without admission.

Finding no persuasive support either from the text of § 1225 or *Jennings*, the petitioners turn to the government's longstanding practice. They point out that the government has, for twenty-nine years, allowed illegal resident aliens, those present without having been admitted, to seek release on bond under § 1226(a) instead of detaining them pursuant to § 1225(b)(2)(A). While that is true, the government's past practice has little to do with the statute's text. The text says what it says, regardless of the decisions of prior Administrations. Years of consistent practice cannot vindicate an interpretation that is inconsistent with a statute's plain text. *See, e.g.*, *Pereira v. Sessions*, 585 U.S. 198, 204, 138 S. Ct. 2105, 2111 (2018).

In *Pereira*, the court considered whether notices to appear for removal proceedings under 1229(a) had to specify the time and place of removal proceedings. *Id.* at 202, 138 S. Ct. at 2110. Despite twenty-one years during which the government consistently served notices to appear that omitted time and place information, the court rejected the government's practice based on the text of § 1229(a). *Id.* at 205, 209, 138 S. Ct. at 2111, 2114. The same approach is appropriate here. Regardless of the government's past practice and regardless of Congress's silence on § 1225(b)(2)(A), the text controls.

In any event, that prior Administrations decided to use less than their full enforcement authority under § 1225(b)(2)(A) does not mean they lacked the authority to do more. Indeed, the Federal Register suggests that past Administrations recognized that IIRIRA conferred more authority upon

17

them than they chose to exercise. Portions of the Federal Register produced in direct response to the enactment of IIRIRA note that "IIRIRA extended the mandatory detention provisions to additional classes of inadmissible and deportable aliens but provided an exception for certain witnesses." *See* Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (March 6, 1997) (codified at 8 C.F.R. pt. 1 et al.). Almost immediately after that, the explanation goes on to acknowledge that "*[d]espite being applicants for admission*, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination." *Id.* (emphasis added). This language appears to concede that unadmitted aliens fell literally within the scope of § 1225, even though other parts of the newly implemented regulations contemplated granting these aliens the possibility of release on bond.

Indeed, an initial regulation (still in effect today) expressly purported to apply mandatory detention under § 1225(b)(2) to unadmitted aliens who had remained present in the United States for several years. For example, 8 C.F.R. § 235.3(b)(1)(ii) provided that:

> An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility *shall be detained in accordance with section 235(b)(2)* of the Act for a proceeding under section 240 of the Act."

8 C.F.R. § 235.3(b)(1)(ii) (emphasis added). This regulatory provision from 1997 looks no different from the government's interpretation in 2025. At the very least, then, some early regulations acknowledged the broad scope of

18

25-20496
c/w No. 25-40701

§ 1225(b)(2)(A).[14]    In contrast to past administrations, the current Administration has chosen to exercise a greater portion of its authority by treating applicants for admission under the provision designed to apply to them.

Moving beyond the government's past practice, the petitioners turn to the statute's history for support. When Congress passed IIRIRA, it estimated that the detention mandate in § 1226(c) would require the detention of 45,000 new immigrants. See H.R. Rep. No. 104-469, pt. 1 at 118, 120, 123 (1996). Supposedly because Congress was worried about insufficient detention capacity, it included a provision that permitted delaying implementation of § 1226(c) for two years. IIRIRA § 303(b), 110 Stat. 3009-586 to 3009-587. IIRIRA did not include a similar provision for § 1225(b)(2)(A), even though, under the government's interpretation, § 1225 (b)(2)(A) would require the detention of far more than 45,000 aliens. See H.R. Rep. No. 104-469, pt. 1, at 111 (estimating that about two million aliens who had entered without inspection were present in the United States around IIRIRA's enactment in 1996). According to the petitioners, Congress would have deferred implementation of § 1225(b)(2)(A) if it truly required the detention of a broad new set of immigrants.

---

[14] From the outset, relevant regulations covering unadmitted aliens present in the U.S. have referenced *both* mandatory detention under Section 1225(b) as well as discretionary bond under Section 1226. *See* 8 C.F.R. Secs. 235.3(b)(1)(ii); 236.1(c)(8),(d). Of course, whether the executive could validly decline to fulfill a mandatory detention provision is another matter. The Supreme Court left this issue unaddressed in *Biden v. Texas,* 142 S. Ct. 2528, 2542 n.5 (2022). But as the government here argues that Sections 1225 and 1226 overlap to some extent, it could exercise the discretion expressly conveyed by Section 1226 to narrow or eliminate the availability of bond for unadmitted alien residents while enforcing the mandatory detention provision in Section 1225(b)(2)(A).

This court declines to speculate about why Congress may or may not have deferred implementation of § 1225(b)(2)(A). "[I]t is never [the court's] job to rewrite ... statutory text under the banner of speculation about what Congress might have done." *Garland v. Cargill*, 602 U.S. 406, 428, 144 S. Ct. 1613, 1626 (2024) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89, 137 S. Ct. 1718, 1725 (2017)). Congress could have declined to delay implementation of § 1225(b)(2)(A) for any number of reasons, and reading into a Congressional omission provides little insight, if any, into the meaning of clear text.

Finally, we observe that the government's interpretation better honors predominant goal in the enactment of IIRIRA. By eliminating the exclusion/deportation dichotomy, IIRIRA put aliens seeking admission lawfully on equal footing with those who entered without inspection. It seems strange to suggest that Congress would have preserved bond hearings exclusively for unlawful entrants. *See* H.R. Rep. No. 104-469, pt. 1, at 225; *Torres*, 976 F.3d at 928 (noting that IIRIRA "did away with th[e] 'entry doctrine ... anomaly" under which "immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully").[15] Preserving this distinction is especially odd where the Department of Justice Inspector General found in 1997 that "when aliens are released from custody, nearly 90 percent abscond and are not removed from the United States." 62 Fed. Reg. at 10323. That situation exists today on a much larger scale. The petitioners' fears about

---

[15] While they do not deny that IIRIRA aimed in part to reduce the disparity between lawful and unlawful applicants for admission, the petitioners respond that IIRIRA accomplished that goal through other provisions, such as § 1225(b)(1) and § 1226(c). Congress undeniably did take other steps to address the entry anomaly. But that does not explain why Congress would preserve one of the most significant advantages available for unlawful entrants.

20

potential abuse of detention pending removal proceedings under Section 1225b2A are wholly speculative. In any event, *Zadvydas v Davis*, 533 U.S. 678, 678, 121 S. Ct. 2491, 2492, (2001), has no direct application to aliens who are detained and being given due process during removal proceedings. Ultimately, because Congress's purpose matters far less than what it wrote, this argument merely confirms what the statutory text already makes clear.

## Conclusion

For the foregoing reasons, the orders of the two district courts are REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

25-20496
c/w No. 25-40701

DANA M. DOUGLAS, *Circuit Judge*, dissenting:

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) was passed in part out of a desire to equalize the treatment of noncitizens presenting at ports of entry for inspection and those apprehended in the interior after effecting an unlawful entry. It pursued this aim in several ways, most prominently by deeming both classes of noncitizens "applicants for admission" subject to the same removal procedures and excluding noncitizens detained based on certain criminal offenses from eligibility for bond.

The Congress that passed IIRIRA would be surprised to learn it had also required the detention without bond of two million people. For almost thirty years there was no sign anyone thought it had done so, and nothing in the congressional record or the history of the statute's enforcement suggests that it did. Nonetheless, the government today asserts the authority and mandate to detain millions of noncitizens in the interior, some of them present here for decades, on the same terms as if they were apprehended at the border.[1] No matter that this newly discovered mandate arrives without historical precedent, and in the teeth of one of the core distinctions of immigration law. The overwhelming majority of courts in this circuit and elsewhere have recognized that the government's position is totally

_____

[1] Despite the long period of undisturbed interpretation of the statutory provisions at issue here, the government has insisted that we take up this issue with unprecedented urgency, in a manner that does not reflect the gravity of the outcome Petitioners face. After our court granted the government's request to expedite this case, the government requested that we further expedite our disposition of the case by issuing an order resolving the appeal with a notation that the opinion would follow. This request appears to be virtually unprecedented in this circuit. Notably, as of February 5, 2026, the government has not made a similar request in its case pending before the Seventh Circuit, the only other circuit that thus far has heard the government's argument on this statutory issue. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, No. 1:18-cv-03757 (7th Cir.), docket.

unsupported. Undeterred, the majority and the government distort the statutory text, abstract it from its context and history, ignore the Supreme Court's clearly stated understanding of the statutory scheme, and wave away the agency's previous failure to detain millions of noncitizens as if it were a rounding error.

And for what? The majority stakes the largest detention initiative in American history on the possibility that "seeking admission" is like being an "applicant for admission," in a statute that has never been applied in this way, based on little more than an apparent conviction that Congress *must have* wanted these noncitizens detained—some of them the spouses, mothers, fathers, and grandparents of American citizens. Straining at a gnat, the majority swallows a camel. I dissent.

I

8 U.S.C. § 1225(a)(1) defines an "applicant for admission" to the United States as "[a]n alien present in the United States who has not been admitted or who arrives in the United States." Section 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." The government detained Petitioners Buenrostro-Mendez and Padron Covarrubias on the grounds that, because they are present in the United States and not admitted, they are applicants for admission, and are therefore subject to mandatory detention under § 1225(b)(2)(A). Unlike 8 U.S.C. § 1226(a), which Petitioners argue applies to them and which the government until recently invoked to detain inadmissible noncitizens already present in the United

23

25-20496
c/w No. 25-40701

States, § 1225(b)(2)(A) makes no provision for release on bond.[2]  Thus, the government asserts the authority to detain Buenrostro-Mendez and Padron Covarrubias without bond pending removal proceedings.[3]

The district courts in both cases consolidated here held that § 1226(a), not § 1225(b)(2)(A), applied to Petitioners.  In Buenrostro-Mendez's case, the district court reasoned that "[a]s almost every district court to consider this issue has concluded, the statutory text, the statute's history, Congressional intent, and § 1226(a)'s application [to noncitizens already present in the United States] for the past three decades support finding that § 1226 applies to these circumstances."  *Buenrostro-Mendez v. Bondi*, No. H-25-3726, 2025 WL 2886346, at *3 (S.D. Tex. Oct. 7, 2025) (citation modified).  In Padron Covarrubias's case, the district court concluded the same, and paused to highlight "two particularly strong statutory interpretation arguments that undercut [the government's] interpretation": namely, (1) that § 1225(b)(2)(A) uses "seeking admission" alongside and in addition to "applicant for admission," and "a variation in terms suggests a variation in meaning," and (2) that reading § 1226 to not apply to inadmissible noncitizens like Padron Covarrubias renders several portions of § 1226 superfluous, including the recently passed Laken Riley Act, because noncitizens subject to mandatory detention under § 1226(c)(1) would already have been subject to mandatory detention under § 1225(b)(2)(A).

_____

[2] The government does not argue that Petitioners pose a flight risk or a danger to the community.  Under the government's previous interpretation of the governing laws, showing that they do not would have been sufficient to secure their release on bond under § 1226(a).  *See Nielsen v. Preap*, 586 U.S. 392, 397–98 (2019).  Detentions under § 1226(a) also require a warrant.  8 U.S.C. § 1226(a).  The government's sole justification for Petitioners' detention is its novel argument that § 1225(b)(2)(A) requires it.

[3] To no one's surprise, and as the government has acknowledged, this change in policy has led to a "tsunami" of habeas petitions being filed within the circuit and beyond.

24

*Covarrubias v. Vergara*, No. 5:25-CV-112, 2025 WL 2950097, at \*3–4 (S.D. Tex. Oct. 8, 2025) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)).

The core issue is whether the phrase "an alien seeking admission" in § 1225(b)(2)(A) limits the sweep of persons subject to mandatory detention under the statute, or whether it merely restates the category of "applicant for admission" defined by § 1225(a)(1) and reproduced in § 1225(b)(2)(A)'s first phrase. The government argues that there is no meaningful difference between an "applicant for admission" and "an alien seeking admission," because the latter category is broader than and includes the former. Because Petitioners are applicants for admission as defined by § 1225(a)(1), therefore, they are necessarily also subject to § 1225(b)(2)(A). This is not a credible reading for several reasons. Instead, consistent with the statutory definition of "admission," the provision's context, the Supreme Court's understanding of the statutory scheme, and the whole history of American immigration law, "seeking admission" means what it sounds like: actively seeking to enter this country. Because I would reject the government's invitation to rubber stamp its proposed legislation by executive fiat, I dissent.

## II

### A

First, the text of the statute supports Petitioners' reading for the reasons already articulated by the district court in Padron Covarrubias's case: the government's reading renders "an alien seeking admission" needless surplusage, and makes several provisions of § 1226 surplusage as well, or, at best, mostly unnecessary because of overlapping with § 1225. This is a whirlpool of statutory confusion where, on Petitioners' reading, there are only still waters. Petitioners provide a simple revision Congress could have

passed had it wished to make noncitizens already present in the United States subject to § 1225(b)(2)(A): "if the examining immigration officer determines that an [applicant for] admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained[.]" Instead, Congress specifically limited the subsection's mandatory detention authority to noncitizens "seeking admission."[4] "If Congress had wanted the provision to have th[e] effect [urged by the government], it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022). On the government's reading, the phrase "alien seeking admission" does no independent work. But "[i]t is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000). The government's reading does not do so.

Conversely, Petitioners' reading gives "seeking admission" independent force—it refers to noncitizens seeking entry into the United States—and chimes with the statutory definition of "admission" as "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); *see Granados v. Noem*, No. SA-25-CA-01464, 2025 WL 3296314, at *6 (W.D. Tex. Nov. 26, 2025) (observing that, when similar petitioners were detained, they "w[ere] not seeking entry, much less 'lawful entry . . . after inspection and authorization'" (quoting 8 U.S.C. § 1101(a)(13)(A))). As the district court in Padron Covarrubias's case recognized, "a variation in terms suggests a variation in meaning." SCALIA & GARNER, *supra*, at 170. The surplusage canon and statutory definition of "admission" reinforce the common-sense

---

[4] Likewise, Congress "could easily have included noncitizens who are 'seeking admission' within the definition [of "applicant for admission"] but elected not to do so." *Castañon-Nava* v. *U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025).

understanding: Petitioners were not "seeking admission" when they were arrested inside the United States. *See Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008) ("Under th[e] statutory definition, 'admission' is the lawful *entry* of an alien after inspection, something quite different, obviously, from post-entry adjustment of status[.]").

The majority, like the government, reasons that "seeking" is like "applying," on an analogy to applying to college and thereby seeking admission. *Ante* at 10. "Applicant for admission," however, is a specifically defined statutory term of art in § 1225(a)(1); "seeking admission" is not. *See de Jesus Aguilar v. English*, No. 3:25-cv-898, 2025 WL 3280219, at *7 (N.D. Ind. Nov. 25, 2025). The majority's attempt to read the definition of "applicant for admission" back into the phrase "seeking admission," as if sharing a word necessitates sharing a meaning, is unpersuasive. "Congress may . . . define a word or phrase [like 'admission'] in a specialized way" but "absent such [a definition], those whose lives are governed by law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages." *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025). The ordinary meaning of "seek" requires some present, active action on the seeker's part. *Seek*, Merriam Webster Online, https://www.merriam-webster.com/dictionary /seek (last visited Feb. 4, 2026) (defining "seek" as, e.g., "to go in search of," to "look for," "to ask for," and "to try to acquire or gain").

Moreover, as other courts have recognized, "[i]n general, a present participle is used to signal present and continuing action." *Francisco T. v. Bondi*, No. 25-cv-3219, 2025 WL 3490809, at *5 (D. Minn. Sept. 5, 2025) (quoting *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1307 (11th Cir. 2022)). Whatever precisely "seeking" means, this difference in part of speech indicates that "seeking admission" is something different from being an "applicant." *See Carr v. United States*, 560 U.S. 438, 448

(2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach."). Combining the ordinary meaning of "seeking" with the statutory definition of "admission," there is no need to resort to strained analogies with the college admissions process to determine the meaning of key statutory terms governing whether a noncitizen must be detained.

Likewise, the government's position that "[m]ere overlap [between § 1225(b)(2)(A) and § 1226(c)(1)] is no basis for re-writing clear statutory text" drastically understates the significance of what it proposes. Section 1226(c)(1) functions as § 1226's own mandatory detention provision, listing criminal and terrorism offenses that render noncitizens otherwise covered by § 1226, and so eligible for bond hearings under § 1226(a), subject to mandatory detention. 8 U.S.C. § 1226(c)(1). This list was expanded just last year by the Laken Riley Act, which added offenses like theft and assault of a law enforcement officer. Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at § 1226(c)(1)(E)). But this Act, and several of the other § 1226(c) exceptions referring to inadmissible noncitizens, would have been largely unnecessary if all inadmissible noncitizens were already subject to mandatory detention without a bond hearing under § 1225(b)(2)(A). *See Santos M.C. v. Olson*, No. 25-CV-4264, 2025 WL 3281787, at *3 (D. Minn. Nov. 25, 2025) ("If the government is correct, there was no reason for Congress to amend § 1226[.]").

The government's reading therefore "violate[s] the canon against interpreting any statutory provision in a manner that would render another provision superfluous[,]" which "of course, applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607 (2010). "A rudimentary principle of textual interpretation—so commonsensical that it scarcely needs

citation—is that if one interpretation of an ambiguous provision causes it to serve a purpose consistent with the entire text, and the other interpretation renders it pointless, the former prevails." *Henderson v. United States*, 568 U.S. 266, 281 (2013) (Scalia, J., dissenting). This is not a mere matter of some overlap at the edges; rather, the government's reading takes a sledgehammer to the statutes Congress wrote, including laws it passed just over a year ago.[5] Nor is it cured by the majority's suggestion that the § 1226(c) exceptions, unlike § 1225(b)(2)(A), also eliminate the possibility of parole. *Ante* at 15. "We assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). If the Laken Riley Act and the other § 1226(c) exceptions for inadmissible noncitizens served primarily to eliminate parole for noncitizens already required to be detained, why not simply add to the lists of parole exceptions at 8 U.S.C. § 1182(d)(5)(B) and 8 U.S.C. § 1184(f) or, more simply, amend the provision that—on the government's novel reading—already required detention of all inadmissible noncitizens, § 1225(b)(2)(A)?[6] The majority's

_____

[5] Furthermore, as Petitioners point out, the government's reading has the perverse effect of rendering noncitizens who are potentially subject to § 1226(c)(1) because they committed serious crimes eligible for discretionary parole under 8 U.S.C. § 1182(d)(5)(C) and resulting potential benefits. The majority suggests that this is not the case, adopting the government's position that § 1226 overlaps with § 1225 so the § 1226(c) exceptions still apply to persons detained under the Laken Riley Act, giving these provisions independent force. *Ante* at 15. But, as the Supreme Court has explained, "subsection (c) [of § 1226] is simply a limit on the authority conferred by subsection (a)." *Preap*, 586 U.S. at 409.

[6] Similarly, the government's argument that, on its reading, some of the § 1226(c) exceptions would still apply to persons who have become deportable due to certain enumerated crimes or who were erroneously admitted only underscores the oddness of its reading. On the government's understanding, the statutory section with the heading "Apprehension and detention of aliens" becomes a set of backstop provisions that halfway overlap with § 1226(b)(2)(A) and halfway do not.

reduction of the Laken Riley Act to an admonitory "and also" provision does not pass muster.

## B

Second, Petitioners' reading of the text is confirmed by the Supreme Court's own clearly stated understanding of the difference between § 1225(b) and § 1226, and by the context and history of those provisions. As the Supreme Court has explained:

> In sum, U.S. immigration law authorizes the Government to detain certain *aliens seeking admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain *aliens already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c).

*Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (emphasis added). The government and the majority essentially argue that this is dicta, but "we are bound by the [Supreme] Court's explications of law, whether dicta or not." *United States v. Hernandez*, 159 F.4th 425, 427 n.1 (5th Cir. 2025); *see also Garrett v. Lumpkin*, 96 F.4th 896, 902 (5th Cir. 2024) ("In this circuit, 'if the statement is necessary to the result *or constitutes an explication of the governing rules of law*, it is not dictum.'" (quoting *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 428 (5th Cir. 2014))).[7] Regardless, the context

---

[7] The majority latches on to a parenthetical aside from *Jennings* to argue that the Supreme Court equates "applicants for admission" with "aliens seeking admission." *Ante* at 17. This passage is taken from a discussion of § 1225(b), with no relevance to the core distinction between § 1225 and § 1226, and suggests only that noncitizens seeking admission are applicants for admission—the reverse of what the government needs to demonstrate. *See Jennings*, 583 U.S. at 297 (referring to "aliens seeking entry into the United States ('applicants for admission' in the language of the statute)"). The Supreme Court has laid out its understanding of the difference between § 1225(b) and § 1226(a) with the clarity of an Immigration Law primer.

and history of these provisions goes entirely against the government's reading. Section 1225's title refers to "Inspection by immigration officers" and "arriving aliens," and § 1225 is replete with references to arrival and inspection. Conversely, § 1226 is titled "Apprehension and detention of aliens," and features none of this language.[8] In view of the statutes' history, this makes perfect sense: as amici curiae immigration law scholars document, § 1225(b)(2)(A) is the descendant of the statutory provisions that have historically governed detention of noncitizens arriving at the borders for well over a hundred years, whereas § 1226 stems from newer interior-detention laws.[9] *See Barco Mercado v. Francis*, No. 25-cv-6582, 2025 WL 3295903, at *7–9 (S.D.N.Y. Nov. 26, 2025) (describing an "unbroken chain of granting discretion to immigration authorities to release noncitizens [living in the United States] pending final removal decisions," beginning with the Immigration and Nationality Act in 1952). With this historical context in mind, § 1225's repeated references to "[i]nspection by immigration officers" and variations on "arrival" are no mistake: § 1225(b)(2)(A) inherits the Immigration Act of 1893's requirement that "it shall be the duty of every inspector of *arriving alien immigrants* to detain for a special inquiry . . . every person who may not appear to him to be clearly and beyond doubt entitled to

---

[8] The government points out that "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947). True enough, but they are "tools available for the resolution of a doubt about the meaning of a statute." *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002)). The meaning of the statute here is at best doubtful.

[9] As amici immigration law scholars also show, the current § 1226 was specifically designed to ensure that noncitizens apprehended in the United States remained eligible for release on bond, as is shown by Congress's changing the bond-release provisions to refer to removal rather than deportability at the same time that it made such noncitizens subject to removal rather than deportation.

admission." Immigration Act of 1893, § 5, 27 Stat. 569, 570 (1893) (emphasis added); *see* 8 U.S.C. § 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."). "[S]eeking admission" is therefore not a throwaway extra phrase, but rather the modern statute's equivalent of the key term limiting its reach to noncitizens "arriving" at the border.[10]

## C

Finally, even if there were any leftover ambiguity, the government's prior practice of detaining inadmissible noncitizens apprehended within this country under § 1226, not § 1225—unbroken for almost thirty years, not to mention the much longer historical practice from which it stems—combined with the familiar "elephants in mouseholes" rule of interpretation, provides independent sufficient reason to reject the government's reading. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes."); *see also Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (explaining the rule in relation to the major questions doctrine, and in terms of "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency" and "consider[ing] context that would be important to a reasonable

---

[10] The core distinction between § 1225(b) and § 1226(a)—that is, between detentions at the border and detentions in the interior—comes as no surprise. "The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," such that even "constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The majority's concern with unequal treatment between noncitizens inspected at the border and noncitizens who have already effected an unauthorized entry is a criticism of one of the bedrock principles of immigration law.

32

observer" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))). True, as the government contends, "past practice does not justify disregard of clear statutory language." *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). But for the reasons set out above, the government's proposed interpretation is far from clear. "[A]n interpreter should 'typically greet' an agency's claim to 'extravagant statutory power' with at least some 'measure of skepticism.'" *Nebraska*, 600 U.S. at 516 (Barrett, J., concurring) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). "Extraordinary grants of . . . authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (quoting *Whitman*, 531 U.S. at 468). And the Supreme Court "has long said that courts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court," and cautioned that "[a] longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred."[11] *Nebraska*, 600 U.S. at 519 (Barrett, J., concurring) (first quoting *Bittner v. United States*, 598 U.S. 85, 97 (2023); and then quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)).

Putting these rules together, it is simply not plausible that the Congress that enacted IIRIRA intended to give the government the authority and mandate to detain all noncitizens unlawfully present in the

---

[11] As Petitioners and amici document, in addition to contradicting its longstanding practice and regulations, the government's assertion of this newfound power and mandate is inconsistent with its representations in other cases before the Supreme Court and our court. *See, e.g.*, Reply Br. for Cross-Appellants/Appellees at 17–18, *Crane v. Johnson*, No. 14-10049 (5th Cir. Sept. 29, 2014) (government explaining that "[t]he ordinary meaning of ['seeking admission'] does not include aliens who . . . have already gained entry to the United States and continuously resided here").

United States without bond. As Petitioners point out, this would have required the detention of millions of people, whereas Congress specifically gave the Attorney General authority to defer the agency's much more modest implementation of § 1226(c)'s new detention mandate, which affected only persons subject to removal based on certain criminal offenses—an estimated *45,000 people* in total—out of a recognition that this mandate alone would strain the agency's limited detention capacity. *See ante* at 19–20. To this, Petitioners add Congress's odd failure to correct, or show any signs of objecting to, the agency's failure to detain the millions of people it purportedly required to be detained. *See Zemel v. Rusk*, 381 U.S. 1, 11 (1965) ("Congress' failure to repeal or revise in the face of such administrative interpretation . . . constitute[s] persuasive evidence that that interpretation is the one [Congress] intended.").[12] For its part, the Department of Justice could hardly have been clearer that its contemporaneous understanding of the statute was the same as Petitioners': "Despite being applicants for admission, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination." Detention and Removal of Aliens, 62 Fed. Reg. 10,312, 10,323 (Mar. 6, 1997); *see United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 613 n.13 (5th Cir. 1980) ("As a contemporaneous construction of a statute by an agency charged with its execution, regulations such as those issued . . . here are traditionally considered strong evidence of Congress' understanding.").[13]

---

[12] The government's counterargument that the BIA never formally adopted the interpretation Petitioners propose, even if true, is beside the point: Congress could hardly have failed to notice this discrepancy. More plausibly, the question never arose because the government's interpretation was unthinkable.

[13] The majority relies on *Pereira v. Sessions*, 585 U.S. 198 (2018) for the argument that an agency can get a statute wrong for many years. *Ante* at 17–18. Of course it can. But the law in *Pereira* was crystal clear against the agency's interpretation on a detailed

25-20496
c/w No. 25-40701

The majority declines to speculate about why Congress or the agency would have acted this way, because "it is never [the court's] job to rewrite . . . statutory text under the banner of speculation about what Congress might have done." *Garland v. Cargill*, 602 U.S. 406, 428 (2024) (alteration in original) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)). But it is also not our job to discard the ordinary tools of statutory interpretation based on speculation about what "better honors the predominant goal in the enactment of IIRIRA," as the majority opinion does. *Ante* at 20. "[N]o law pursues its purposes at all costs." *Luna Perez v. Sturgis Public Schs.*, 598 U.S. 142, 150 (2023) (citation modified). "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). By engaging in wide-ranging speculation about how one of the purposes of § 1225(a)(1) must change the common sense reading of § 1225(b)(2)(A), the government invites us in effect to legislate from the bench—an invitation this court should decline.

Nor are we "required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). No

---

procedural issue, whereas here the longstanding practice is consistent with the ordinary meaning of the statute and the agency's failure to enforce it can hardly have escaped Congress's notice. *Pereira*, 585 U.S. at 201–02. Moreover, the majority's reference to "twenty-one years during which the government consistently" misapplied the statute in *Pereira*, *ante* at 18, is overstated; the cited text refers to an agency practice of failing to meet statutory requirements "at least in recent years," 585 U.S. at 204. The majority's citation to this portion of the Federal Register as if it showed that applicants for admission were not entitled to bond without the agency's permission is hard to explain. *Ante* at 18.

one has ever thought that § 1225(b)(2)(A) means what the government and majority say it means—because it does not mean it. Congress did not secretly require two million noncitizens to be detained without bond, when nothing like this had ever been done before, and the whole history of American immigration law suggested it would not be.[14] We would "expect more than simple statutory silence if, and when, Congress were to intend a major departure." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017). This is to say nothing of this hidden power's enormous "economic and political significance," which is another "reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159). Amici American Immigration Council and American Immigration Lawyers Association describe the obviously enormous impact of requiring the detention without bond of potentially millions of noncitizens long present in the United States, including noncitizens with citizen spouses, children, and grandchildren, and noncitizens otherwise specially protected by other statutory schemes due to their youth, status as survivors of crime, abuse, or trafficking, or other hardships. This is a quintessential elephant-in-a-mousehole interpretation, and is all the more suspect because of the inconsistency of the agency's views and its longstanding failure to assert this hidden power.

---

[14] The government's and the majority's repeated references to the expedited removal provision and regulations implementing it to suggest that § 1225(b) contemplates the removal of certain noncitizens in the interior only proves the rule: that § 1225(b) is, as the Supreme Court has made clear, a port-of-entry statute. *Ante* at 18–19. When Congress has stretched § 1225 detentions at all beyond persons arriving in this country—as in the case of certain expedited removals—it has been painstakingly clear, set time limits, and required specific designations by the Attorney General. *See* 8 U.S.C. § 1225(b)(1)(A); 8 C.F.R. § 235.3(b)(1)(ii). The majority omits entirely the context of the latter regulation within a set of "[e]xpedited removal" provisions. 8 C.F.R. § 235.3(b).

25-20496
c/w No. 25-40701

## III

The government's counterarguments are not persuasive. Its opening brief several times makes some variety of the argument that "x principle of statutory interpretation cannot overcome the statute's clear meaning." The reason it does so is obvious: as the vast majority of district courts and the only court of appeals to address this issue have recognized, the principles of statutory interpretation go firmly the other way. *See, e.g.*, *Castañon-Nava*, 161 F.4th at 1060–62 (preliminary ruling); *Granados*, 2025 WL 3296314, at *5–6; *de Jesus Aguilar*, 2025 WL 3280219, at *6–8; *Santos M.C.*, 2025 WL 3281787, at *2–3; *Barco Mercado*, 2025 WL 3295903, at *7–9.[15] At its core, the government's argument hinges on some arguable statutory ambiguity at the margins and a single sentence of legislative history suggesting that the Congress that passed the IIRIRA wished to move toward equalizing the treatment of inadmissible noncitizens apprehended inside the country and those apprehended at the border—which, as Petitioners show, it accomplished by ample other means, such as by combining deportation and exclusion proceedings into a single removal proceeding where all bear the burden of showing they are not inadmissible. *See* H.R. Rep. No. 104-469, pt.1, at 225 (1996) (commenting that definition of "applicant for admission" at § 1225(a)(1) was intended to "replace certain aspects" of doctrine whereby "illegal aliens who have entered the United States without inspection [to] gain equities and privileges" unavailable to noncitizens presenting at a port of entry, explaining that it does so by making "the pivotal factor in *determining an alien's status* . . . whether or not the alien has been

_____

[15] As of the submission of Petitioners' Addendum on January 26, 2026, the count in this circuit was 29 district judges in the Fifth Circuit in their favor, and 6 judges against; or, 105 cases for and 31 cases against.

25-20496
c/w No. 25-40701

lawfully admitted," but saying nothing about detention (emphasis added)).[16]
With respect, this is the mistake of "looking over a crowd and picking out
your friends." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568
(2005) (citation modified). An ambiguous subsection not at issue here and
legislative history that expresses only a general statutory purpose cannot
overcome Petitioners' far better reading.

As for the statutory ambiguity, the majority and the government place
significant weight on 8 U.S.C. § 1225(a)(3), which states that "[a]ll aliens
(including alien crewmen) who are applicants for admission or otherwise
seeking admission or readmission to or transit through the United States shall
be inspected by immigration officers," arguing that "otherwise" signals that
noncitizens "who are applicants for admission" are a subset of noncitizens
"seeking admission." For all the reasons set out above, the government's
reading of this one adjacent subsection cannot outweigh the text, context, and
history of the statutory provision actually at issue. Even assuming it
somehow could, Petitioners point to § 1225(a)(3)'s obvious contextual
application to transit into and through the country, and propose a plausible
alternative reading.[17] More fundamentally, the government's argument rests
on an elementary grammatical error and a misunderstanding of the phrase
"or otherwise." First, the government equates the phrase "aliens . . . who

---

[16] In addition to equalizing removal procedures and providing for mandatory
detention based on certain criminal offenses, IIRIRA also provided for enhanced border
security and infrastructure, bars on persons deported after residing in the country without
lawful status, and a novel expedited removal process. The majority's argument essentially
is that this was not enough.

[17] Petitioners also point to other statutes that use "or otherwise" without signaling
a category-subset relationship. *See* 22 U.S.C. § 7103(d)(7)(C) (requiring report of "the
number of persons who have applied for, been granted, or been denied a visa or otherwise
provided status under [other provisions]"); 38 U.S.C. § 8102(b) ("No medical facility may
be constructed or otherwise acquired or altered except [under specified circumstances].").

are applicants for admission or otherwise seeking admission or readmission to or transit through the United States" with a syntactic construction like "a doctor's directive to 'bike, jog, or otherwise exercise.'" But the government's example is a simple list of verbs (bike, jog, exercise); that is, all the elements in the series are the same part of speech.[18] Section 1225(a)(3)'s list reflects a mix of parts of speech: the noun "applicants for admission" alongside the adjectival present participle "seeking" and participial phrase "seeking admission or readmission." Thus, the subsection Congress actually wrote is more like saying, at the end of football season, "All students who are football players or otherwise seeking to play football or cheerlead should come to the gym for an info session this evening." In a grammatical void, we might be tempted to equate "football players" with "students seeking to play football," or deem the former a subset of the latter, but the players on the actual football team (the high school equivalent of a statutory term of art) would likely disagree.[19] Second, this use of "otherwise" is

_____

[18] The case law the government cites for its interpretation is the same: in *Villarreal v. R.J. Reynolds Tobacco Co.*, the Eleventh Circuit analyzed an "otherwise" that simply connected two verbs. 839 F.3d 958, 963–64 (11th Cir. 2016) (en banc); *see also Kleber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019) (same).

[19] To drive home the point, there may be football players who are not seeking to play football (or cheerlead) because they do not wish to play football next year, or because they are graduating. Nonetheless, they have been called to the gym. Thus, "football players" is neither equivalent to *nor a subset of* "students seeking to play football or cheerlead." Petitioners make the same point with a hypothetical statute referring to "registered voters" and individuals "seeking to vote." To take another example from the origins of modern English, Chaucer uses the word "otherwise" in the same way: "To take a wyf . . . / Men moste enquere . . . / Whe[the]r she be wys, or sobre, or dronke[n], / Or proud, or ells ootherweys a shrewe, / A chide[r], or wastour of thy good[s]." GEOFFREY CHAUCER, THE RIVERSIDE CHAUCER 157 (Larry D. Benson ed., 3d ed. 2008). "Ootherweys" here links a series of adjectives with a series of nouns without in any way suggesting that one is a subset of the other. *See Wright v. United States*, 108 F. 805, 816 (5th Cir. 1901) (Pardee, J., dissenting) (citing "[t]he ancient Chaucer, the father of English poetry" to explain the word "murder").

consistent with the dictionary definition of the phrase "or otherwise," which is simply "used to refer to something that is different from something already mentioned." *Or otherwise*, Merriam Webster Online, https://www.merriam-webster.com/dictionary/or%20

otherwise (last visited Jan. 31, 2026); *see also J.G.O. v. Francis*, No. 25-CV-7233, 2025 WL 3040142, at *3 (S.D.N.Y. Oct. 28, 2025) ("[Or']s 'ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings.' . . . On top of that, th[e government's reading] . . . invit[es] surplusage into the statute. That Congress chose to include this additional phrase—'seeking admission'—not once but . . . multiple times suggests that it must mean something distinct." (quoting *Loughrin v. United States*, 573 U.S. 351, 357 (2014))). There is thus no necessary subset-category relationship between "applicant for admission" and "seeking admission," even in § 1225(a)(3).[20]

As for the legislative history, as indicated above, the reference to a single sentence of a House Report suggesting Congress wished to equalize treatment of noncitizens at the border and in the interior does not give the government the footing it thinks it does. To the extent that the panel could rely on a single statement of general purpose (commenting on a different subsection) to interpret an ambiguous statute, Petitioners supply statements

---

[20] The majority's discussion of § 1225(a)(5) is even less persuasive. *Ante* at 13. Section 1225(a)(5) states that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States . . . ." The majority says this "strongly suggests" that applicants for admission are also seeking admission. *Id.* But all this shows is that § 1225(a)(5) is, like § 1225(b)(2)(A), about applicants for admission *who are seeking admission*. The majority goes looking for clues that § 1225's provisions apply to noncitizens who are seeking admission and finds them—because § 1225, with the exception of § 1225(a)(1)'s definitions provision, *is about noncitizens attempting to enter the United States*.

specifically conveying that the Congress that passed IIRIRA intended to preserve the historic status quo whereby noncitizens apprehended in the interior would be eligible for bond and the equivalents of § 1225(b)(2)(A) applied to noncitizens arriving in the country. *See* H.R. Rep. No. 104-469, pt. 1, at 229 (1996) ("Section 236(a)[, codified at § 1226(a),] restates the current provisions . . . regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States."); H.R. Rep. No. 104-828, at 209 (1996) (Conf. Rep.) ("New section 235(b)[, codified at § 1225(b),] establishes new procedures for the inspection and in some cases removal of *aliens arriving in the United States.*" (emphasis added)). As the government argues in its reply, "[l]egislative history is especially weak when where there are competing or conflicting sources," and, as outlined above, Congress pursued the general purpose identified by the government by multiple other means. *See Exxon Mobil*, 545 U.S. at 568. In any case, a statement of general purpose attached to a separate definition provision at § 1225(a)(1) must carry less weight than statements about the specific issue disputed here: whether Congress intended to preserve bond eligibility for the relevant class of noncitizens.[21] *See United States v. Meade*, 175 F.3d 215, 219 (1st Cir. 1999) ("[I]n analyzing legislative history, specificity breeds credibility; thus, particularized explanations of how specific provisions of an act are meant to work have been deemed more instructive than generalized pronouncements anent statutory purpose.");

---

[21] The majority is confused throughout its opinion about the purpose of this definition provision. *Ante* at 14. If § 1225(b)(2)(A) doesn't apply to noncitizens already present in this country, it asks, why does § 1225(a)(1) discuss such noncitizens at all? The answer is simple: § 1225(a)(1) does the crucial work of defining inadmissible noncitizens already in the country as within the category of "applicants for admission," which renders them subject to the same removal proceedings as noncitizens detained at ports of entry. *See* 8 U.S.C. § 1229a (discussing removal proceedings applying to all "applicants for admission").

*Nat'l Wildlife Fed. v. Gorsuch*, 693 F.2d 156, 178 (D.C. Cir. 1982) ("Caution is always advisable in relying on a general declaration of purpose to alter the apparent meaning of a specific provision.").

Finally, the majority repeatedly asks why Congress would have preserved "one of the most significant advantages available for unlawful entrants" despite its general purpose of placing applicants seeking admission on equal footing with applicants already present in the country. *Ante* at 21. This "seems strange to suggest." *Id.* at 20. Petitioners, the majority opines, offer "no commonsense explanation why, as a general matter, Congress would want to deny bond only to those lawfully seeking admission into the country." *Id.* at 21. There are a few: (1) bond has always been available to detained noncitizens already present in the United States; (2) as this practice exemplifies, government intrusions have always been tolerated at the border that would be intolerable in the interior, for the obvious reason that citizens and noncitizens alike expect to be able to go about their business without having to show that they are "clearly and beyond doubt entitled to be admitted" if taken, or mistaken, for an otherwise inadmissible noncitizen; and (3) with only a little imagination, the government's and the majority's reading means that anyone present in this country at any time must carry the precise kinds of identification they would otherwise have only carried to the border for international travel, lest they be mistaken for an inadmissible noncitizen "seeking admission" into the country. The majority seems to be unable to imagine what it might mean to be detained within the United States without the appropriate proof of admissibility, and, without a bond hearing, to require the services of a *federal habeas corpus lawyer* to show that one is entitled to release and deserves to see the outside of a detention center again. This is not, or not just, a matter of human sympathy, but rather a matter of understanding one of the core distinctions in immigration law, and the very good reasons for it. *See Zadvydas*, 533 U.S. at 693.

Anyway, the majority's reflections on congressional purpose sit oddly beside the statement that "[u]ltimately, . . . Congress's purpose matters far less than what it wrote[.]"  With this, the majority achieves a perfect inversion: by focusing intently on Congress's general purpose as stated in a single comment on § 1225(a)(1)'s definition of "applicant for admission," the majority spirits away the crucial phrase "seeking admission" in § 1225(b)(2)(A), the text that is actually under review.  Nothing less was required to upend this country's historic immigration practices based on the idea that college applicants necessarily seek admission to college.  Starting from a purpose-centered reading of the wrong statutory provision, the majority produces textualism without the text.

*　　*　　*

In sum, the government's proposed reading of the statute would mean that, for purposes of immigration detention, the border is now everywhere.  That is not the law Congress passed, and if it had, it would have spoken much more clearly.  I dissent.